UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                      Case No:  2:15-cr-59-FtM-38MRM

YOHANY HERNANDEZ-HERNANDEZ
_____

<u>**REPORT AND RECOMMENDATION**</u>

**TO THE UNITED STATES DISTRICT COURT**

> **I.      Introduction**

This cause is before the Court on Defendant Yohany Hernandez-Hernandez's Motion to

Suppress (Doc. 39) filed on July 8, 2015.  The Government filed a Response in Opposition to

Defendant's Motion to Suppress Evidence (Doc. 40) on July 20, 2015.  This matter was referred

for a report and recommendation and an evidentiary hearing was held before the undersigned on

August 12, 2005.  At the hearing, the Court granted the parties leave to file supplemental briefs

in support of their respective positions.  On August 19, 2015, Defendant filed a Supplemental

Memorandum in Support of Motion to Suppress (Doc. 55).  The Government filed a

Supplemental Memorandum of Opposition to Defendant's Motion to Suppress Evidence (Doc.

56) on August 26, 2015.  A Transcript of the Motion to Suppress Hearing (hereinafter cited as

"Tr." followed by the appropriate page number) was filed on September 8, 2015.  Defendant is

charged with transportation of aliens unlawfully in the United States in violation of 8 U.S.C. §§

1324(a)(1)(A)(ii) and (a)(1)(B)(i).  (Doc. 12 p. 1).  Defendant's motion seeks to suppress all

evidence obtained during a traffic stop that occurred on May 7, 2015, near mile marker 137 on

Interstate 75 (I-75) in Lee County, Florida.  For the reasons explained below, the Court

respectfully recommends that Defendant's Motion to Suppress be **DENIED**.

## II.    Summary of Evidence

The Government presented the testimony of three law enforcement witnesses at the suppression hearing:  Detective Dash Lockhart, Sergeant Frank Treska, and Detective George Camacho.  The Government entered three exhibits into evidence:  a video of the traffic stop (Exhibit 1); a transcription and translation of the traffic stop (Exhibit 2); and a composite exhibit of photographs taken of the inside of Defendant's vehicle (Exhibit 3a-u).  Defendant did not call any witnesses, but entered two exhibits into evidence:  a copy of the warning issued by law enforcement to Defendant (Exhibit C), and a satellite image showing an aerial view of the area on I-75 where the traffic stop occurred (Exhibit F).

### A.  Testimony of Det. Lockhart

Det. Lockhart testified as follows.  He has been a detective with the Lee County Sheriff's Office for four years.  (Tr. 14).  He is a detective with the Highway Interdiction Unit.  (Tr. 14).  As a member of the Highway Interdiction Unit he patrols I-75 looking for criminals moving up and down the Interstate.  (Tr. 14).

On May 7, 2015, Det. Lockhart was travelling southbound in his marked Chevy Tahoe patrol vehicle on I-75 around mile marker 137.  (Tr. 14-15).  In that area of I-75, there are three southbound lanes.  (Tr. 15).  Det. Lockhart observed a white Chevy SUV with a Louisiana license plate travelling southbound in the center lane.  (Tr. 15).  Det. Lockhart observed the vehicle change lanes into the right lane without using its turn signal, cutting off and almost hitting a silver BMW.  (Tr. 15).  Det. Lockhart testified that the silver BMW had to slam on its brakes and move into the center lane to avoid being hit.  (Tr. 15-16).

Det. Lockhart began making his way towards the white Chevy SUV to initiate a traffic stop.  (Tr. 17).  Det. Lockhart positioned his vehicle behind the white Chevy SUV, activated his emergency lights, and pulled the white Chevy SUV over to the right shoulder.  (Tr. 17).  Det.

Lockhart called the traffic stop out on the radio dispatch to let others know where he was located. (Tr. 17). Det. Lockhart then approached the vehicle and made contact with the driver and occupants of the vehicle through the front passenger-side window. (Tr. 17). Det. Lockhart immediately noticed that the vehicle had several objects hanging from the rearview mirror, including stuffed animals, sticks, and beads. (Tr. 17). Det. Lockhart also noticed that there was a religious doll in the center console. (Tr. 17). Det. Lockhart also noticed that there were six passengers in the car, they all were of Spanish descent, and they looked extremely scared. (Tr. 17). Det. Lockhart explained that they "looked like they saw a ghost" and were just staring straight ahead. (Tr. 17-18).

Det. Lockhart explained to the driver, Defendant, that he had stopped him because Defendant had cut another motorist off when he changed lanes. (Tr. 17). Det. Lockhart noticed that the driver did not speak English very well. (Tr. 17). Det. Lockhart asked Defendant for his driver's license and Defendant handed over his Texas driver's license. (Tr. 17). Det. Lockhart noticed that Defendant was nervous and that his hands were shaking when he did so. (Tr. 18). Once he obtained Defendant's license, Det. Lockhart brought Defendant to the patrol vehicle while Defendant's driver's license was searched. (Tr. 18). Det. Lockhart told Defendant that as long as Defendant's driver's license was valid and Defendant did not have any warrants, Defendant would be given only a warning and allowed to proceed on his way. (Tr. 18).

Det. Lockhart testified that he had difficulty explaining to Defendant what was going on because Defendant appeared to speak Spanish, not English. (Tr. 18). Det. Lockhart asked Defendant questions such as where he was going and who was in the car, but Defendant had difficulty understanding. (Tr. 18-19). Det. Lockhart then requested Det. Camacho to assist on scene because Det. Camacho is a fluent Spanish speaker. (Tr. 19). Det. Lockhart testified that he requested Det. Camacho's assistance so he could explain the reason for the stop, make sure

that the Defendant knew the reason for the ticket, that Defendant was not receiving a citation, and that Defendant would not have to go to court.  (Tr. 19).  Det. Lockhart wanted Det. Camacho to explain these things so Defendant would know he cannot "cut somebody off like that."  (Tr. 19).

While waiting for Det. Camacho, Det. Lockhart tried to engage Defendant in small talk so he could "speed things along" and provide Det. Camacho with information when Det. Camacho arrived.  (Tr. 19).  Det. Lockhart asked Defendant where he was coming from, who the occupants in the car were, and if they were family.  (Tr. 20).  Det. Lockhart testified that Defendant initially said that the occupants in the car were his family, but later he said they were just his friends.  (Tr. 20).  Det. Lockhart testified that Defendant was having difficulty answering questions.  (Tr. 20).  This conversation occurred next to the passenger side of Det. Lockhart's patrol vehicle.  (Tr. 21).  Det. Lockhart testified that Defendant was not in custody, was not handcuffed, nor had guns been drawn on Defendant at this point.  (Tr. 22).

Det. Lockhart testified that Sgt. Treska was not with Det. Lockhart when he initiated the stop, but he arrived within a minute of Det. Lockhart pulling the car over.  (Tr. 23).  Sgt. Treska was on scene the entire time Det. Lockhart spoke to Defendant.  (Tr. 23).

Det. Lockhart testified that Det. Camacho arrived on scene approximately twelve minutes after being called.  (Tr. 22).  After speaking with Defendant and the passengers, Det. Camacho told Det. Lockhart and Sgt. Treska that he believed there was human smuggling.  (Tr. 22).

On cross examination, Det. Lockhart testified that Defendant was not free to leave from the initiation of the traffic stop until his eventual arrest.  (Tr. 30-31).  Det. Lockhart testified that he had already called in Defendant's vehicle's tag before he exited his vehicle and approached Defendant.  (Tr. 31).  Det. Lockhart approached Defendant's vehicle on the passenger side for safety and told Defendant he would be given a warning.  (Tr. 32).  Det. Lockhart asked

Defendant for his driver's license, which Defendant provided, and then Det. Lockhart asked Defendant to step out of the vehicle. (Tr. 32). Det. Lockhart removed a large folding pocket knife that was clipped on Defendant's pocket and then patted him down for more weapons and none were found. (Tr. 32).

Det. Lockhart testified that he had not seen anything hanging from Defendant's vehicle's rearview mirror prior to the stop. (Tr. 33). Det. Lockhart testified that Sgt. Treska arrived on scene shortly after Defendant got out of his vehicle. (Tr. 35). Sgt. Treska approached Defendant's vehicle and when he returned he told Det. Lockhart that "he had a donkey," referring to a human trafficking case. (Tr. 35).

Det. Lockhart testified that Defendant had presented a valid Texas driver's license. (Tr. 36). Det. Lockhart ascertained that it was valid because he ran the driver's license through the National Criminal Information Center database. (Tr. 36). Det. Lockhart testified that he called for Det. Camacho's assistance after Sgt. Treska stated that they "had a donkey." (Tr. 40). Det. Lockhart testified that Sgt. Treska did not obtain the rental agreement after his first visit to Defendant's vehicle. (Tr. 42).

Det. Lockhart testified that he engaged in casual conversation with Defendant. (Tr. 42). Det. Lockhart asked Defendant such things as where he was coming from, how many people were in the car, whether Defendant had a rental agreement, and the identity of the passengers. (Tr. 42-43). Det. Lockhart testified that these questions did not relate to whether Defendant had changed lanes improperly. (Tr. 43). Det. Lockhart testified that Defendant was asked to identify the female passenger and Defendant correctly did so. (Tr. 43). Det. Lockhart testified that all the information needed to issue a warning was contained on Defendant's driver's license. (Tr. 46). Det. Lockhart testified that the time stamp on the warning citation was 15:57, which was within eight minutes of the initiation of the traffic stop. (Tr. 47).

Det. Lockhart testified that he believed there was reasonable suspicion for more than the traffic stop at the time Sgt. Treska made the statement that the officers had a "donkey." (Tr. 50-51). Det. Lockhart testified that the religious item on the console was a factor in finding reasonable suspicion. (Tr. 51-52). Det. Lockhart testified that the passengers were very nervous and that Defendant's hand seemed to be shaking when he presented his driver's license. (Tr. 53). Det. Lockhart testified that he did not know if Defendant understood him when he asked if the passengers were Defendant's family members. (Tr. 59). Det. Lockhart testified that a pipeline check was performed on Defendant's vehicle, which is a computer search that tells where a vehicle has last been spotted. (Tr. 64-65). A pipeline check is not normally performed as part of a routine traffic stop. (Tr. 65).

Det. Lockhart testified that he was approximately a couple hundred yards behind Defendant's vehicle when he first saw it. (Tr. 65). Det. Lockhart testified that he had a clear view of the vehicle, but he was not close enough to see the tags. (Tr. 66). Det. Lockhart testified that the BMW that was nearly hit and cutoff by the white Chevy SUV continued to travel southbound and that it is not captured in the video recording of the traffic stop. (Tr. 67).

Det. Lockhart testified that the BMW slammed on its breaks, but the BMW did not move from one side to the other; it maintained the same direction. (Tr. 70). Det. Lockhart testified that the BMW had to slam on its breaks to maintain a safe following distance. (Tr. 70).

On redirect, Det. Lockhart testified that he knew the silver BMW slammed on its brakes because he could see the BMW's brake lights come on, the BMW slow down, and the gap increase between Defendant's vehicle and the BMW, and the BMW change lanes. (Tr. 73).

**B. Testimony of Sgt. Treska**

Sgt. Treska testified as follows. He has worked for the Lee County Sheriff's Office since 2006 and has been a police officer since 1993. (Tr. 82). He is a sergeant with the Highway

Interdiction Team. (Tr. 82). As a sergeant, he supervises other law enforcement officers. (Tr. 82). He has served as a sergeant for a year and a half, and prior to that, as a detective with the Highway Interdiction Team since 2007. (Tr. 82-83).

On May 7, 2015, Sgt. Treska assisted Det. Lockhart in conducting a traffic stop near mile marker 137 on I-75. (Tr. 83). After Det. Lockhart had Defendant exit his vehicle and come to the patrol vehicle, Sgt. Treska approached Defendant's vehicle to obtain the registration documents. (Tr. 83). While at the passenger's side of Defendant's vehicle, Sgt. Treska immediately noticed what he considered to be indicators of criminal activity. (Tr. 84). One of the first things he noticed was that there was a large amount of items hanging from the rearview mirror, including religious paraphernalia. (Tr. 84). Sgt. Treska explained that persons engaged in criminal activity will often personalize a rental vehicle. (Tr. 85). Sgt. Treska knew when he approached Defendant's vehicle that it was a rental because rental vehicles display stickers that are used for bar-coding purposes. (Tr. 85).

Sgt. Treska testified that another indicator of criminal activity was the Elegua statue in the center console. (Tr. 86). Sgt. Treska testified that such religious imagery is a red flag because many drug cartels will carry patron saints of some type or other religious items that they believe will protect them from law enforcement. (Tr. 86). Sgt. Treska testified that the Elegua statue alone did not indicate criminal activity, but it did so in the context of all the other indicators. (Tr. 87). Sgt. Treska testified that another indicator was the placement of aftermarket shades on the vehicle's windows. (Tr. 88). Sgt. Treska also noted that there was a clear plastic bag containing hamburgers. (Tr. 87-88).

Another indicator to Sgt. Treska was that there were six people inside the vehicle that looked exhausted. (Tr. 88). Sgt. Treska testified that the female passenger was very nervous, her lip was quivering, and that she was on the verge of tears. (Tr. 89). Sgt. Treska testified that

the woman looked as if she was about to tell him that something had happened to her.  (Tr. 89).

Sgt. Treska testified that he was unable to communicate with the passengers in the van because there was a language barrier, as everyone spoke Spanish and he cannot.  (Tr. 89).

Sgt. Treska knew that Det. Lockhart had initiated a stop because he could see it occurring in front of him as he was travelling southbound on I-75.  (Tr. 90).  He did not witness the incident that caused Det. Lockhart to initiate the traffic stop.  (Tr. 91).

On cross examination, Sgt. Treska testified that the Elegua statue was not in itself a criminal indicator, but within the context of the stop, it was a piece of a puzzle suggesting criminal activity.  (Tr. 95-96).  Sgt. Treska testified that other religious items such as a crucifix, Saint Christopher medal, a Buddha, rosary beads, an Islamic crescent, or a Star of David can also be criminal indicators in a certain context.  (Tr. 97-98).

Sgt. Treska testified that Defendant had placed aftermarket shades in the rental vehicle, and had not had the windows tinted.  (Tr. 101).  Sgt. Treska testified that he attempted to obtain the rental agreement on his first approach to the vehicle, but that the female passenger would not open the glove box, and there were communication problems.  (Tr. 103).  Sgt. Treska went back to let Det. Lockhart know to be on alert, because his initial observations made him believe the situation was a human trafficking case.  (Tr. 103-104).  According to Sgt. Treska, it was after the initial approach that he determined Det. Camacho should be called due to the communication issues.  (Tr. 104).

Sgt. Treska testified that the sworn statement he completed after the stop was not accurate in that it states he noticed the criminal indicators on his second trip to Defendant's vehicle.  (Tr. 106).  Sgt. Treska testified that he noticed the criminal indicators on his first approach.  (Tr. 105-106).  Sgt. Treska testified that Det. Camacho was requested to appear on scene to make sure that the female passenger was not being held against her will.  (Tr. 107).

Sgt. Treska testified that he found it significant that Defendant was of Cuban descent in the context that he was in a rental vehicle with six people of different nationalities coming from an area that is near the border.  (Tr. 108-109).

On redirect examination, Sgt. Treska testified that the first thing he noticed when he approached the vehicle was that the female passenger's lip was quivering as if she was about to cry.  (Tr. 111).  The next thing he noticed was the Elegua statue.  (Tr. 111).  Sgt. Treska testified that when Det. Camacho arrived, he told him to make sure that everyone inside the vehicle was safe and that he did not want anyone running off.  (Tr. 114).

On recross examination, Sgt. Treska testified that he made no mention of his concerns regarding the female passenger in his sworn statement of the incident.  (Tr. 115).

**C.  Testimony of Detective Camacho**

Det. Camacho testified as follows.  He works with the Lee County Sheriff's Office Highway Interdiction Team.  (Tr. 120).  He has been employed by the Lee County Sheriff's Office for eight years and with the Interdiction Team for two years.  (Tr. 120).  Det. Camacho testified that he is a native Spanish speaker and that he learned the language from growing up in Cuba.  (Tr. 120).

Det. Camacho testified that on May 7, 2015, he was requested to provide translation assistance at a traffic stop at mile marker 136 on I-75.  (Tr. 121).  When he arrived on scene, Det. Camacho was directed to go to the vehicle and speak to the occupants.  (Tr. 122).  Det. Camacho went to Defendant's vehicle and spoke to an occupant named Cervantes.  (Tr. 123).  Det. Camacho asked Cervantes some question as to the group's travel plans, itinerary, and the purpose of the trip.  (Tr. 123).  Cervantes told Det. Camacho that he was living in Houston, Texas, and that he had answered a newspaper ad offering trips around the United States.  (Tr. 124).  Cervantes inquired about a trip to Florida, a female met him at an undisclosed location in

Houston, picked him up in a vehicle, and took him to a residence where he met Defendant. (Tr. 124). Det. Camacho testified that none of the other passengers wanted to give any information and that they appeared very nervous. (Tr. 124).

After he spoke to Cervantes, Det. Camacho made contact with Defendant and asked him where he had picked up the people in the car. (Tr. 125). In response, Defendant stated that the passengers were illegal and that they could be found in any Home Depot in the country. (Tr. 125). Moments later, Defendant claimed that he was taking the passengers to his residence in West Palm Beach, Florida. (Tr. 128). When Det. Camacho approached Defendant, Defendant was at the passenger side of Det. Lockhart's vehicle. (Tr. 128). Defendant was not in handcuffs at the time and none of the officers had their weapons drawn. (Tr. 128). Sometime later, Defendant was secured in the back seat of Sgt. Treska's car, at which time Sgt. Treska contacted Customs and Enforcement. (Tr. 129).

On cross examination, Det. Camacho testified that Defendant was already detained by the time he arrived on scene. (Tr. 136). Det. Camacho testified that Defendant was pulled over for a traffic stop and was not free to leave until law enforcement was done with official business. (Tr. 137). Det. Camacho testified that he did not know it was a criminal investigation when he arrived on scene. (Tr. 137).

Det. Camacho testified that he was not involved in translating Defendant's personal information to Det. Lockhart. (Tr. 138). He was also not involved in any conversation relating to the improper changing of lanes. (Tr. 138). His initial role was taking passengers out of the vehicle. (Tr. 139). The passengers were removed from the vehicle and sat in the shade by the highway. (Tr. 141). They were each interviewed and asked what their names and birthdays were, and what the purpose of the trip was. (Tr. 141).

Det. Camacho then approached Defendant and began to ask him questions. (Tr. 142).

Det. Camacho did not give Defendant *Miranda* warnings.  (Tr. 143).  Det. Camacho asked

Defendant how he knew the passengers, which was not for the purpose of determining whether

Defendant had made an improper lane change, but as casual conversation.  (Tr. 144).

Det. Camacho testified that he would not allow Defendant to use the restroom on the side

of the highway when Defendant requested to do so.  (Tr. 146).  It was at this point that Det.

Camacho asked Defendant if he had his permission to search the vehicle.  (Tr. 146).  At some

point, Defendant said, "Why are you blocking me?"  (Tr. 147).  Det. Camacho testified that he

had done something to block Defendant, but he could not recall exactly what he had done.  (Tr.

148).  Shortly after Defendant made this comment, Det. Camacho asked for permission to search

the vehicle.  (Tr. 148).  Det. Camacho understood Defendant's response to give consent to

search.  (Tr. 148-49).

### III.   Analysis

Defendant argues that suppression is warranted on four grounds:  (1) the Government

failed to establish the initial traffic stop was lawful; (2) Defendant was illegally detained; (3)

there was no lawful basis to search the vehicle; and (4) the statements made by Defendant were

obtained in violation of *Miranda v. Arizona*.  The Court addresses each argument below.

### A.  Whether the initial traffic stop was lawful.

Defendant argues that the Government has failed to establish that Defendant violated Fla.

Stat. § 316.085(2) and, thus, also that Det. Lockhart had probable cause to initiate a traffic stop.

(Doc. 55 p. 15-17).  Defendant argues that there are no Florida cases instructive on whether

simply causing another driver to apply the brakes amounts to interfering with the safe operation

of another vehicle.  (Doc. 55 p. 16).  In addition, Defendant contends that Det. Lockhart was not

in a position to testify that Defendant's alleged lane change interfered with the safe operation of

the BMW given that Det. Lockhart was approximately 200 yards behind Defendant when the

alleged violation occurred.  (Doc. 55 p. 17).  In response, the Government argues that Det. Lockhart's personal observation of Defendant's lane change gave Det. Lockhart probable cause to initiate the traffic stop.  (Doc. 56 p. 6).

Law enforcement "may stop a vehicle when there is probable cause to believe that the driver is violating any one of the multitude of applicable traffic and equipment regulations relating to the operation of the motor vehicles." *United States v. Strickland*, 902 F.2d 937, 940 (11th Cir. 1990) (internal quotation marks, citations, and ellipses omitted).  Under Florida law, "[n]o vehicle shall be driven from a direct course in any lane on any highway until the driver has determined that the vehicle is not being approached or passed by any other vehicle in the lane or on the side to which the driver desires to move and that the move can be completely made with safety and without interfering with the safe operation of any vehicle approaching from the same direction."  Fla. Stat. § 316.085(2).

In this case, Det. Lockhart testified that on May 7, 2015, at approximately 3:49 p.m., he observed Defendant's vehicle traveling southbound in the center lane on I-75 near mile marker 137.  (Tr. 14-15).  Without using his turn signal, Defendant changed lanes from the center lane to the far right lane.  (Tr. 15).  When Defendant did so, he cut off a silver BMW that was traveling southbound in the far right lane.  (Tr. 15).  Det. Lockhart observed the silver BMW slam on its brakes to avoid being hit and then quickly moved to the center lane.  (Tr. 15-16).  The Court credits this testimony and finds that the traffic stop was lawful as Det. Lockhart had probable cause to believe that Defendant had violated Fla. Stat. § 316.085(2).

The Court rejects Defendant's argument that probable cause is lacking in this case because the law is unclear as to whether simply causing another driver to apply the brakes amounts to interfering with the safe operation of another vehicle under Fla. Stat. § 316.085(2). Citing to *United States v. Cooper*, 133 F.3d 1394 (11th Cir. 1998), Defendant implies that for a

violation of Fla. Stat. § 316.085(2) to have occurred, it must be necessary for the cut-off vehicle to apply the brakes to *actually avoid* an accident.  (Doc. 55 p. 16-17).

In *Cooper*, the Eleventh Circuit found that the district court did not clearly err in finding that law enforcement had probable cause to believe that the defendant had violated Fla. Stat. § 316.085(2) given testimony that the defendant had merged into the lane of a law enforcement vehicle "without a safe amount of distance between their cars, causing [law enforcement] to apply his brakes to avoid an accident."  *Cooper*, 133 F.3d at 1398.

The Court does not construe Fla. Stat. § 316.085(2) so narrowly as to require that a violation only occurs when the application of the brakes is necessary to avoid an accident. Neither does the Court read *Cooper* as establishing such a requirement.  Moreover, Det. Lockhart testified that Defendant almost hit the silver BMW and that he "almost caused an accident."  (Tr. 15, 19, 70).  While Defendant is correct that Det. Lockhart also testified that he could not say that an accident would have occurred if the silver BMW did not brake, Det. Lockhart did testify that at the very least it was necessary for the silver BMW to slam on its brakes to maintain a safe following distance.  (Tr. 70-71).  Under these facts, regardless of whether Det. Lockhart can positively say that an accident would or would not have occurred, the Court finds that Det. Lockhart had probable cause to initiate a stop for violation of Fla. Stat. § 316.085(2).

Finally, the Court rejects Defendant's argument that Det. Lockhart's testimony cannot be relied upon because he was too distant from Defendant's vehicle to determine whether a violation of Fla. Stat. § 316.085(2) actually occurred.  No matter the distance he was from Defendant's vehicle, the Court credits Det. Lockhart's testimony that he could "clearly see what happened."  (Tr. 69).  The Court finds that the traffic stop of Defendant was lawful.

**B.  Whether Defendant was illegally detained.**

Defendant argues he was illegally detained on two grounds.  First, Defendant argues that there was no reasonable suspicion to detain Defendant pending the arrival of Detective Camacho on scene.  (Doc. 55 p. 1).  Second, Defendant argues that the detention was not shown to be within the permissible duration and scope of a routine traffic stop.  (Doc. 55 p. 8).  The Court addresses Defendant's second argument first.

### 1)  Whether Defendant's detention was within the permissible duration and scope of a routine traffic stop.

Citing to *Rodriguez v. United States*, 135 S. Ct. 1609 (2015), Defendant argues that the Government failed to establish that Defendant's detention was within the permissible scope and duration of a routine traffic stop.  (Doc. 55 p. 8-10).  In response, the Government argues that law enforcement's actions were in the permissible scope and duration of the traffic stop.

In *Rodriguez*, the Supreme Court held that absent reasonable suspicion, the extension of a routine traffic stop beyond its mission constitutes an unreasonable seizure in violation of the Fourth Amendment.  *Id.* at 1614.  The Supreme Court explained that "[b]ecause addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate that purpose.  Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."  *Id.* (citations and quotations omitted).

In this case, the testimony elicited at the hearing shows that Defendant was detained longer than necessary to effectuate the purpose of the traffic stop, *i.e.*, the issuance of a warning for an illegal lane change.  Det. Lockhart testified that the warning citation he generated was completed within eight minutes of the time he stopped Defendant and a few minutes before Det. Camacho arrived on scene.  (Tr. 47).  Even assuming that Det. Camacho was needed to effectuate the purpose of the stop by explaining to Defendant the warning he was being issued,

Defendant was still detained longer than necessary to effectuate the purpose of the traffic stop. Upon arriving on scene, Det. Camacho did not translate any statements by Defendant relating to the traffic violation, but immediately proceeded to question the passengers in Defendant's vehicle. (Tr. 122, 138). When Det. Camacho did finally speak with Defendant, he did not ask about the lane change violation, but inquired as to how Defendant knew the passengers in his vehicle. (Tr. 125). Based on these facts, the Court finds that Defendant was detained longer than necessary to effectuate the original purpose of the traffic stop.

Although Defendant was detained longer than necessary to be given a warning for an illegal lane change, it does not follow that he was unlawfully detained. An officer may detain a driver "for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring." *United States v. Pruitt*, 174 F.3d 1215, 1220 (11th Cir. 1999). Thus, the determinative issue is whether law enforcement had reasonable suspicion of criminal activity apart from the lane-change violation by the time law enforcement could have effectuated the original purpose of the stop.

### 2) Whether there was reasonable suspicion to detain Defendant beyond the time necessary to effectuate the original purpose of the traffic stop.

Defendant argues that there was no reasonable, articulable suspicion to justify his detention beyond the time necessary to effectuate the original purpose of his traffic stop. (Doc. 55 p. 1). Defendant contends that the "criminal indicators" cited by law enforcement as justifying the detention do not survive scrutiny, are not sufficiently probative of criminal activity, or are impermissible in the reasonable suspicion calculation. (Doc. 55 p. 2).

The Government contends that Det. Lockhart and Sgt. Treska had reasonable suspicion that Defendant was engaged in illegal activity beyond the traffic violation. (Doc. 56 p. 8). The

Government argues that the criminal indicators, looked at as a whole picture, gave law enforcement reasonable suspicion to detain Defendant.  (Doc. 56 p. 8).

When reviewing the reasonable suspicion determination of law enforcement,

> the Court looks to the totality of the circumstances to see if the officer has a particularized and objective basis for suspecting legal wrongdoing.  *U.S. v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981). Police officers are allowed to make inferences from their own experience and specialized training and make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.  *U.S. v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002) (citing *Cortez*, 449 U.S. at 418, 101 S. Ct. 690).  The concept of reasonable suspicion is not reducible to a "neat set of legal rules," and conduct which is innocent in itself may still establish reasonable suspicion in light of an officer's specialized training and familiarity with the customs of an area's inhabitants.  *Id.* at 274–276, 122 S. Ct. 744.  A determination that reasonable suspicion exists need not rule out the possibility of innocent conduct.  *Id.* at 277–278, 122 S. Ct. 744.  If reasonable suspicion exists, an officer may "stop the person for a brief period of time and take additional steps to investigate further."  *Hiibel v. Sixth Judicial District Court of Nevada*, 542 U.S. 177, 124 S. Ct. 2451, 2458, 159 L. Ed. 2d 292 (2004).

*United States v. Davis*, 65 F. Supp. 3d 1352, 1357 (M.D. Fla. 2014).  While courts have used a variety of terms to describe what cause is sufficient to authorize police to stop a person, "the essence of all that has been written is that the totality of the circumstances—the whole picture—must be taken into account."  *Cortez*, 449 U.S. at 417-18.  The Supreme Court has "made clear that reasonable suspicion may exist even if each fact 'alone is susceptible of innocent explanation.'"  *United States v. Bautista-Silva*, 567 F.3d 1266, 1272-73 (11th Cir. 2009) (citing *Arvizu*, 534 U.S. at 277-78).

In this case, while the individual facts cited by law enforcement, taken individually, may not give rise to reasonable suspicion, viewing the facts in combination and under the totality of the circumstances, the Court finds that law enforcement had reasonable suspicion that Defendant was engaged in the criminal activity of human smuggling or trafficking.  Moreover, that

reasonable suspicion arose almost immediately after the initiation of the traffic stop, well before

the purpose of the stop was effectuated.  Sgt. Treska testified that upon approaching Defendant's

vehicle for the first time, he observed a female passenger with a quivering lip that appeared to be

scared, almost to the point of tears, and he believed she was being held against her will.  (Tr. 89,

107, 111, 115).  Det. Lockhart and Sgt. Treska testified that Defendant's vehicle, a rental car,

had been personalized by the placement of religious beads and a stuffed animal on the rearview

mirror, and an Elegua statue in the center console.  (Tr. 17, 84, 86).  Det. Lockhart and Sgt.

Treska also took note of the fact that Defendant had applied aftermarket shades on the back

windows of the vehicle which, in their experience, is indicative of an attempt to conceal criminal

activity.  (Tr. 54, 56, 88).  The officers testified that their suspicion was also raised by the fact

that Defendant is Cuban and the six passengers of the vehicle were of other different

nationalities.  (Tr. 109).  Defendant and the passengers appeared unduly nervous given the nature

of the stop.  (Tr. 53, 54, 124).  Sgt. Treska testified that he found it suspicious that the vehicle

was coming from a location near the border.  (Tr. 109).  In addition, Sgt. Treska testified that he

found the plastic bag containing hamburgers to be a criminal indicator.  (Tr. 87-88, 102-103).

Insofar as law enforcement may have found the Elegua statue or religious beads, each

standing alone, to be an indicator of criminal activity, the Court rejects this as an articulable

grounds for reasonable suspicion.  As Defendant properly notes, quoting from *United States v.

Magana*, 544 F. Supp. 2d 560, 570 (W.D. Tex. 2008), "because displaying a religious symbol on

a vehicle constitutes symbolic speech, and is protected by the First Amendment, it is

impermissible for law enforcement to use religious paraphernalia in their reasonable suspicion

calculation."  In the context of this case, however, the Court finds the Elegua statue and religious

beads only relevant to the extent they are evidence of the personalization of Defendant's rental

vehicle, not as criminal indicators themselves.  In other words, it is not the religious or spiritual

nature of the objects that warrants their inclusion in the reasonable suspicion calculation, but rather the fact that the rental vehicle was personalized to such an extent that it raised reasonable suspicion by law enforcement.

Additionally, law enforcement also found that Defendant's inconsistent statements concerning his relation to the passengers was an indicator of criminal activity.  (Tr. 53-55, 60).  These allegedly inconsistent statements were made in response to questions asked in English by Det. Lockhart and Sgt. Treska.  (Tr. 60).  Given the acknowledged language barrier that existed, the Court finds that any inconsistency in Defendant's statements concerning his relationship to the passengers does not support a finding of reasonable suspicion.

However, the Court rejects Defendant's contention that law enforcement unlawfully considered his ethnicity in determining reasonable suspicion.  (*See* Doc. 55 p. 4) (citing to *United States v. Pruitt*, 174 F.3d 1215, 1221 (11th Cir. 1999)).  In this case, law enforcement did not find the fact that Defendant was Cuban as indicative of human smuggling or trafficking, but rather the fact that the six passengers in his vehicle were of different nationalities than Defendant.  Defendant cites to no authority showing that such a consideration is impermissible in the reasonable suspicion calculation, particularly where the suspicion that arose was one of human trafficking or smuggling.

While the Court finds that law enforcement had reasonable suspicion to detain Defendant for human smuggling or trafficking, the issue remains whether law enforcement had reasonable suspicion prior to the time law enforcement could have reasonably effectuated the purpose of the initial traffic stop.  The Court finds that law enforcement had such reasonable suspicion.  The facts supporting law enforcement's reasonable suspicion of human smuggling or trafficking were ascertained in the initial encounters Det. Lockhart and Sgt. Treska had with Defendant, his vehicle, and the passengers inside the vehicle.  These encounters occurred prior to the time the

warning citation was generated eight minutes into the stop and Det. Camacho arrived on scene twelve minutes into the stop.[1]   While additional evidence of human smuggling or trafficking was uncovered after Defendant's vehicle was searched, the probable cause supporting Defendant's detention was based on Det. Lockhart and Sgt. Treska's initial observations of Defendant, his vehicle, and the vehicle's passengers.

In sum, the Court finds that under the totality of the circumstances, law enforcement had reasonable suspicion that Defendant was engaged in the criminal activity of human smuggling or trafficking prior to the time law enforcement could effectuate the initial purpose of the traffic stop.  As a result, Defendant was not unlawfully detained.

### C.  Whether there was a lawful basis to search the vehicle.

During the traffic stop, the following exchange occurred in Spanish between Defendant and Det. Camacho:

| | |
|---|---|
| Det. Camacho: | Let me check you real quick.  You've had problems with the law? |
| Defendant: | Yes, I have them -- I have a problem (unintelligible) in court, and stuff -- uh, can I pee for a moment? |
| Det. Camacho: | No, no -- |
| Defendant: | Oh, I can't? |
| Det. Camacho: | -- I can't -- I can't let you pee right now -- |
| Defendant: | (Unintelligible)? |
| Det. Camacho: | (Unintelligible). |
| Defendant: | Okay.  Oh, man. |

---

[1] The video recording of the traffic stop shows that Det. Lockhart and Sgt. Treska had each approached Defendant's vehicle within the first three minutes of the traffic stop.  (*See* Gov.'s Ex. 1).

| Det. Camacho: | Uh, well, will you give me permission to check your car to see if there's anything illegal there? |
|---|---|
| Defendant: | (Unintelligible) why are you blocking me then? |
| Det. Camacho: | We're blocking you because -- because we're doing an investigation now. |
| Defendant: | Yes, that's fine, but, and -- |
| Det. Camacho: | With your permission, because to -- to -- verify your -- |
| Defendant: | Yes, do whatever you want. |
| Det. Camacho: | No -- |
| Defendant: | Whatever you -- you -- (unintelligible) |
| Det. Camacho: | -- with -- with your permission -- |
| Defendant: | Yes. |
| Det. Camacho: | -- will you let me check the car? |
| Defendant: | Do whatever you want, of course. |
| Det. Camacho: | Okay.  One moment. |
| Defendant: | Yes |

(Gov.'s Ex. 2).[2]

Defendant argues that the Government has failed to establish that Defendant's consent was voluntary.  (Doc. 55 p. 13).  Defendant argues that he did not give law enforcement permission to search his vehicle, but merely acquiesced to lawful authority.  (Doc. 55 p. 13).  In response, the Government argues that under the totality of the circumstances, Defendant voluntarily consented to a search of his vehicle.  (Doc. 56 p. 18).  The Government contends that

---

[2] The Court notes that the quoted exchange occurs on the last two pages of the Government's Exhibit 2.  The exhibit does not contain page numbers.

Defendant was not in custody at the time he gave consent, law enforcement did not use coercive procedures, Defendant was cooperative, and there is no indication that Defendant was of below-average intelligence or otherwise deficient in his ability to understand law enforcement.  (Doc. 56 p. 20).

"It is well settled under the Fourth and Fourteenth Amendments that a search conducted without a warrant issued upon probable cause is '*per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'"  *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). "One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent."  *Id.*  "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *Id.* (citing *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)).  "In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents."  *Id.*  In determining whether consent was given voluntarily, courts must scrutinize the facts and strike a balance between a defendant's right to be free from coercive conduct and the legitimate need of the government to conduct lawful searches.  *Id.*

The Eleventh Circuit recognizes six factors relevant to assessing voluntariness:  (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedure; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent to the search; (5) the defendant's education and intelligence; and significantly, (6) the defendant's belief that no incriminating evidence will be found.  *United States v. Welch*, 683 F.3d 1304, 1308-09 (11th Cir. 2012) (citing *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)).  The government bears the burden of proving

that the defendant consented to the search and that the consent was given freely and voluntarily, and was not mere acquiescence to a claim of lawful authority. *United States v. Massell*, 823 F.2d 1503, 1507 (11th Cir. 1987) (citing *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968)).

In this case, the Court finds that Defendant freely and voluntarily gave his consent to law enforcement to search his vehicle. While Defendant was detained due to a traffic stop at the time he gave consent to law enforcement to search his vehicle, Defendant's detention did not constitute a restraint on freedom to the degree associated with formal arrest. Law enforcement did not handcuff, threaten, abuse, or otherwise intimidate Defendant prior to Defendant agreeing to the search. Defendant was directed to step out of his vehicle and stand near the passenger's side of Det. Lockhart's vehicle as a safety precaution. (Tr. 21). Defendant was on the side of I-75, a public thoroughfare, during daylight hours at the time he gave consent. Only three law enforcement officers were present. In addition, Defendant cooperated with law enforcement by complying with their requests. Defendant gave his consent in Spanish and there is no indication that Defendant's education or intelligence were so deficient as to undermine his ability to consent to a search of his vehicle. Although there is evidence that Defendant was not informed by law enforcement that he could refuse to allow the search, the weight of the factors shows that Defendant's consent was freely given.

Defendant argues that the fact that Defendant was asked for his consent to search while being denied the ability to relieve himself and his statement that the "officers" were "blocking him" undermines the Government's position that Defendant consented to the search. (Doc. 55 p. 13). The Court disagrees. As Det. Camacho explained at the hearing, Defendant was not allowed to relieve himself because he was on the shoulder of a public road and females were present. (Tr. 146). There is no indication that law enforcement used this circumstance to

coerce Defendant into giving consent to search.  As to the Defendant's statement that the

officers were "blocking him," the Court finds that this does not negate the voluntariness of his

consent to search.  Det. Camacho testified that he could not remember what the word

"blocking" referred to, but there is no evidence that it indicates a threat of force or intimidation

that would negate the voluntariness of Defendant's consent.  Finally, the fact that law

enforcement had Defendant's license does not negate the voluntariness of his consent.  *See*

*United States v. Purcell*, 236 F.3d 1274, 1282 (11th Cir. 2001).

### D.  Whether the statements made by Defendant were obtained in violation of *Miranda v. Arizona*.

Defendant argues that the statements he made during the stop were obtained in violation

of *Miranda v. Arizona*, as the questioning by Det. Lockhart and Det. Camacho was aimed at

matters outside the scope of the traffic stop and, thus, this questioning constituted an unwarned

custodial interrogation.  (Doc. 55 p. 14-15).  The Government argues that Defendant was not in

custody at the time he made the statements.  (Doc. 56 p. 17).

The Fifth Amendment provides that no person "shall be compelled in any criminal case

to be a witness against himself."  U.S. Const. amend. V.  A court must exclude from evidence

any incriminating statements made by an individual if, prior to making the statement, the

individual was not warned of his right to remain silent and the right to obtain counsel—the so-

called *Miranda* rights.  *United States v. Luna-Encinas*, 603 F.3d 876, 880 (11th Cir. 2010).

Before *Miranda* warnings are required, a defendant must be in custody and under interrogation.

*Id*. (citing *United States v. Castro*, 723 F.2d 1527, 1530 (11th Cir. 1984) (per curiam)).  "A

defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or

restraint on freedom of movement of the degree associated with a formal arrest.'"  *United States*

*v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (citing *California v. Behler*, 463 U.S. 1121,

1125 (1983)).  The Court must consider the totality of the circumstances surrounding the interrogation and whether a reasonable person in the suspect's position would feel that "'a restraint on his freedom of movement to such extent that he would not feel free to leave.'"  *Id*. (citing *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001)).  The test is an objective one from the prospective of a reasonable innocent person and, therefore, the beliefs of the defendant and the agents are not relevant.  *Id*. (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)).

"Generally, a person temporarily detained pursuant to an ordinary traffic stop is not 'in custody' for the purposes of Miranda."  *United States v. Crawford*, 294 F. App'x 466, 473 (11th Cir. 2008) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).  An officer may ask a "moderate number of questions" relating to a person's identity and to dispel the officer's suspicions; however, a detainee is not required to respond.  *Berkemer*, 468 U.S. at 439.  "The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda."  *Id*. at 440.

In this case, the Court rejects as unpersuasive Defendant's contention that because Det. Lockhart and Det. Camacho posed questions to Defendant that were not directly related to the traffic violation for which he was originally stopped, law enforcement was required to provide a *Miranda* warning.  (Doc. 55 p. 15).  By finding that there was probable cause that Defendant was engaged in illegal activity beyond a traffic violation, the nature of Defendant's detention did not change from a stop analogous to a "Terry stop," *see Terry v. Ohio*, 392 U.S. 1 (1968), into a formal arrest requiring a *Miranda* warning.  There is no evidence that Defendant was subjected to restraints comparable to formal arrest at the time he made his statements.  To the contrary, Defendant made his statements while on the shoulder of a public thoroughfare in view of the general public.  *See Berkemer*, 468 U.S. at 438 (noting that "exposure to public view both

reduces the ability of an unscrupulous policeman to use illegitimate means to elicit self-incriminating statements and diminishes the motorist's fear that, if he does not cooperate, he will be subjected to abuse.").  In addition, Defendant gave his statements while only two to three law enforcement officers were conducting the stop.  *Id.*.

Defendant was not entitled to *Miranda* warnings until he was placed in custody, which was after he made the statements at issue here.  Accordingly, the Court finds that Defendant's statements were not obtained in violation of *Miranda*.

### IV.  Conclusion

For the reasons set forth above,

**IT IS RESPECTFULLY RECOMMENDED THAT:**

Defendant's Motion to Suppress (Doc. 39) be **DENIED**.

**Respectfully recommended** in Chambers in Fort Myers, Florida on October 29, 2015.

MAC R. MCCOY
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES

A party waives the right to challenge on appeal a finding of fact or conclusion of law adopted by the District Judge if the party fails to object to that finding or conclusion within fourteen days after issuance of the Report and Recommendation containing the finding or conclusion.

Copies furnished to:

Counsel of Record
Unrepresented Parties