UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

VS.                                                                      CASE NO: 2:15-cr-59-FtM-38MRM

YOHANY HERNANDEZ-HERNANDEZ

## **ORDER**[1]

This case comes before the Court on consideration of Magistrate Judge Mac R. McCoy's Report and Recommendation (Doc. #65) filed on October 29, 2015, which recommends denying Defendant Yohany Hernandez-Hernandez's Motion to Suppress Evidence (Doc. #39). Defendant filed objections to the Report and Recommendation (Doc. #69), to which the Government elected not to respond. This matter is ripe for review.

## **BACKGROUND**

The Court adopts the factual findings set forth in the Report and Recommendation (Doc. #65 at 2-11), and it need not rehash those facts in detail here. In brief, around 3:49 p.m. on May 7, 2015, Detective Dash Lockhart of the Lee County Sheriff's Office observed a white Chevrolet Tahoe sports utility vehicle ("SUV") change lanes on Interstate 75 without using a turn signal and almost striking another car. Florida law prohibits such careless driving, see Fl. Stat. § 316.085(2), and on that basis, Detective Lockhart pulled

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or websites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

over the SUV.  Before exiting his patrol vehicle, Detective Lockhart called in the traffic stop and the SUV's license plate number.

Detective Lockhart approached the SUV on the passenger side.  He explained to Defendant, the driver, the reason for the stop and asked for his driver's license. Defendant provided a Texas license, and Detective Lockhart asked Defendant to accompany him to his patrol car while he checked the information.  He advised Defendant that as long as his driver's license was valid and he had no warrants, he could leave with only a warning. During this initial exchange, Detective Lockhart observed six passengers of Spanish descent in the SUV all of whom looked nervous, a religious statue in the center console, and a cluster of beads, sticks, and stuffed animals hanging from the rearview mirror.

Defendant exited the SUV at Detective Lockhart's request.  Detective Lockhart removed a pocketknife clipped to Defendant's pocket and patted him down – he found no other weapons.  At that point, Sergeant Frank Treska of the Lee County Sheriff's Office arrived on scene.  Sergeant Treska approached the passenger side of the SUV, while Detective Lockhart and Defendant continued to the patrol car.

At the SUV, Sergeant Treska noticed a car rental bar-code sticker.  He asked the female passenger in the front seat for the rental agreement.  There was a language barrier and she was unable to help.  At this time, Sergeant Treska observed – what he believed to be – indicators of criminal activity, including religious paraphernalia hanging from the rearview mirror, a Elegua statue in the center console, aftermarket shades on the SUV's windows, a clear plastic bag containing hamburger rolls, and exhausted and nervous looking passengers.

During the foregoing, Detective Lockhart ran a records check on Defendant. While waiting for the results, Detective Lockhart asked Defendant, in English, where he was going. Defendant, a Spanish-speaker, struggled to understand, but indicated they were traveling to West Palm Beach, Florida. At that point, Sergeant Treska returned to the patrol car and alerted Detective Lockhart that they had a human trafficking situation. Detective Lockhart agreed. Detective Lockhart then asked Defendant if they were travelling from Texas, to which Defendant replied affirmatively and explained that is where they worked.

From there, Detective Lockhart requested the assistance of Detective George Camacho, a native Spanish-speaker, because of the communication barriers. While waiting for Detective Camacho, Detective Lockhart and Sergeant Treska asked Defendant how long they would be in West Palm; if he knew his passengers' names; if he rented the SUV; where he was going in West Palm; and details about his job as a truck driver in Houston, Texas. Defendant responded to each question as best he could. Sergeant Treska also checked Defendant's waistband for any weapons and retrieved the SUV's rental papers from its glove box. Detective Lockhart eventually issued Defendant a written warning citation with a time stamp of 3:57 p.m., which was approximately eight minutes after the initiation of the traffic stop.

Detective Camacho arrived on scene approximately twelve minutes after the initial traffic stop. He started with the passengers in the SUV. He removed a male passenger from the backseat and spoke to him for approximately five minutes. Detective Camacho then spoke to the other passengers about the group's travel plans, itinerary, purpose of

the trip, and relation to each other while they remained inside the vehicle. Sergeant Treska was present during these conversations.

While Detective Camacho and Sergeant Treska spoke to the passengers, Defendant and Detective Lockhart remained at the patrol car. Detective Lockhart asked Defendant about, *inter alia*, his social security number, where he lived in West Palm Beach, if he had drugs in the SUV, and whether he had large sums of money.

After speaking to the passengers, Detective Camacho approached Defendant. In Spanish, he asked Defendant how he knew the passengers, where he picked them up, and whether he was nervous. Detective Camacho thereafter confronted Defendant about transporting illegal aliens. Defendant explained that he was taking them to his home in West Palm Beach and they were to help him. Defendant then asked to relieve himself but Detective Camacho would not allow him to do so on the side of the highway. Detective Camacho followed by asking if he could search the SUV for anything illegal. Defendant responded, "(Unintelligible) why are you blocking me then?" Detective Camacho replied they were conducting an investigation. Detective Camacho again asked for permission to search the SUV, to which he replied, "Do whatever you want, of course." Detective Camacho testified that he understood Defendant to have consented to the search. At no point during this sequence or before was Defendant given the warnings prescribed by *Miranda v. Arizona,* 384 U.S. 436 (1966). Sometime later, Defendant was secured in Sergeant Treska's patrol car, at which time he contacted Customs and Enforcement.

The dashboard camera on Detective Lockhart's patrol vehicle captured the traffic stop and events thereafter. (Gov. Ex. 1). A written transcript and translation of the video was also introduced at the evidentiary hearing. (Gov. Ex. 2).

4

On May 13, 2015, a federal grand jury indicted Defendant for knowingly transporting five illegal aliens within the United States for financial gain in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), (a)(1)(B)(i).  Defendant filed the instant Motion to Suppress Evidence (Doc. #39), to which the Government opposed (Doc. #40).  On referral, Magistrate Judge McCoy held an evidentiary hearing on August 12, 2015.  (Doc. #50). The parties filed supplemental briefs following the hearing.  (Doc. #55; Doc. #56). The subsequent Report and Recommendation recommends denying Defendant's motion. Defendant now takes issue with certain findings and legal conclusions from the Report and Recommendation.  (Doc. #69).

## STANDARD OF REVIEW

After conducting a careful and complete review of the findings and recommendations, a district judge may accept, reject, or modify a magistrate judge's report and recommendation.  *See* 28 U.S.C. § 636(b)(1); *United States v. Powell,* 628 F.3d 1254, 1256 (11th Cir. 2010).  A district judge "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1)(C); *see also United States v. Farias-Gonzalez,* 556 F.3d 1181, 1184 n.1 (11th Cir. 2009).  The district judge reviews legal conclusions *de novo,* even in the absence of an objection.  *See Cooper-Houston v. So. Ry. Co.,* 37 F.3d 603, 604 (11th Cir. 1994).  A district court may not reject the credibility determination of a magistrate judge without personally rehearing disputed testimony from the witness.  *See Powell,* 628 F.3d at 1256-58.

## DISCUSSION

Defendant raises four objections to the Report and Recommendation. (Doc. #69). First, he challenges the Report and Recommendation's finding that Detective Lockhart lawfully stopped him for the traffic violation. Second, even if lawfully stopped, he argues that the Report and Recommendation erred in finding reasonable suspicion of criminal activity to detain Defendant after the initial stop concluded. Third, he argues that, contrary to the Report and Recommendation, he did not consent freely and voluntarily to the search of the SUV. Fourth and finally, Defendant asserts because his detention exceeded the permissible scope of a traffic violation and the deputies launched a criminal investigation, *Miranda* warnings were required before he was interrogated. Because of said errors, Defendant moves to suppress all evidence derived from the traffic stop, including the testimony of all witnesses identified during the stop, all items found during the search of the SUV, and all statements attributed to Defendant. The Court will address each argument in turn.

**A. The Traffic Stop**

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. Amend. IV. A traffic stop constitutes a seizure under the Fourth Amendment. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Such a stop is constitutional if it is based on probable cause that a traffic violation has occurred or is justified by reasonable suspicion in accordance with *Terry v. Ohio*, 392 U.S. 1 (1968). *See United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008). Florida law prohibits a car from being

> driv[en] from a direct course in any lane on any highway until the driver has determined that the vehicle is not being approached or passed by any other vehicle in the lane or on the side to which the driver desires to move and

6

>that the move can be completely made with safety and without interfering
>with the safe operation of any vehicle approaching from the same direction.

Fla. Stat. § 316.085(2).  The Court agrees with the Report and Recommendation that Detective Lockhart had probable cause to believe that Defendant committed a traffic infraction in his presence.  (Doc. #65 at 12-13).  The Magistrate Judge credited Detective Lockhart's testimony regarding his observations of Defendant's driving – particular his testimony that he could "clearly see what happened" – and rejected Defendant's argument that the detective's testimony could not be relied on because he was too distant from Defendant's vehicle to determine whether a violation actually occurred.  (Doc. #65 at 12-13).  Consequently, the traffic stop of Defendant's vehicle was lawful, and the Court overrules Defendant's objections on this point.

**B. The Detention**

The Report and Recommendation's findings on Defendant's detention are twofold. It finds first that the detention was not within the permissible duration and scope of a routine traffic stop under Rodriguez v. United States, 135 S. Ct. 1609 (2015). (Doc. #65 at 14-15).  The Report and Recommendation then finds there was reasonable suspicion to hold Defendant beyond the time necessary to effect the original purpose of the traffic stop, and thus the detention was permissible.  (Doc. #65 at 15-19).  Defendant objects only to the latter finding.  (Doc. #69 at 5-15).

Generally, a traffic stop "must last no longer than is necessary to effectuate the purpose of the stop."  United States v. Pruitt, 174 F.3d 1215, 1220 (11th Cir. 1999). "[P]olice officers conducting a traffic stop may prolong the detention to investigate the driver's license and the vehicle registration, and may do so by requesting a computer check."  United States v. Boyce, 351 F.3d 1102, 1106 (11th Cir. 2003).  An officer also

may lengthen a stop for "further questioning beyond that related to the initial stop" in two circumstances. See *Pruitt,* 174 F.3d at 1220. "First, the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion [that] illegal activity has occurred or is occurring." *Id.* "Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." *Id.* Here, the determinative issue here is whether the officers had reasonable suspicion of criminal activity apart from the lane-change violation by the time they could have effectuated the original purpose of the stop.

The Court concurs with the Report and Recommendation's finding that the duration of the traffic stop was permissibly extended. Much of the traffic stop took place after the officers had reasonable suspicion to believe Defendant was trafficking or smuggling illegal aliens. Such is reflected by the dash camera video, where within the first few minutes the officers observed after-market tint on the windows of a rental car coming from a known trafficking area, several unidentified passengers that appeared nervous, and paraphernalia strewn throughout the car that is often carried by human traffickers on belief it will ward off police. Such evidence taken together was more than sufficient to continue the stop for further investigation and specifically until a Spanish-speaking officer could arrive. In addition, although additional evidence of human smuggling or trafficking was uncovered after Defendant's SUV was searched, the reasonable suspicion supporting his detention was based on the officer's initial observations of Defendant, the SUV, and the passengers.

Although not addressed by either party, the Court finds it pertinent to discuss briefly the Report and Recommendation's initial finding that the stop was prolonged beyond the

8

limits proscribed in *Rodriguez v. United States*, 135 S.Ct. 1609 (2015). *See Cooper–Houston,* 37 F.3d at 604 (explaining that district courts should review legal conclusions *de novo,* even in the absence of an objection). In *Rodriguez*, the Supreme Court addressed "the question of whether police routinely may extend an otherwise-completed traffic stop, *absent reasonable suspicion*, in order to conduct a dog sniff." 135 S.Ct. at 1614 (emphasis added). It held that "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizure." However, because the appellate court did not review the magistrate judge's finding that the defendant's detention for the dog sniff was not independently supported by individualized suspicion, *id.* at 1612, the Supreme Court remanded for it to decide "whether reasonable suspicion of criminal activity justified detaining [the defendant] beyond completion of the traffic infraction investigation," *id.* at 1616-17. In this case, because the officers had reasonable suspicion to detain defendant regarding transporting illegal aliens before the warning citation, the Court finds that a *Rodriguez* analysis is not applicable. Consequently, the Court will not adopt the Report and Recommendation's findings as it relates to *Rodriguez*.

In sum, the Court finds that under the totality of the circumstances, the officers had reasonable suspicion that Defendant was engaged in criminal activity of human smuggling or trafficking prior to the time they could affect the initial purpose of the traffic stop. Consequently, Defendant was lawfully detained.

## C.  Search of the SUV

Next, the Court agrees with the Report and Recommendation that the search of the vehicle was lawful. (Doc. #65 at 19-23). Defendant argues that he merely acquiesced

to lawful authority and thus the Government failed to establish that his consent was voluntary.  (Doc. #69 at 15-17).

As stated, the Fourth Amendment shields against unreasonable searches and seizures.  U.S. Const. Amend. IV.  In general, a search of a person is unreasonable if it is not authorized by a warrant.  It is a well-settled exception to the warrant requirement that an individual may waive his Fourth Amendment rights by giving voluntary and intelligent consent to a warrantless search of his person.  Whether a defendant voluntarily consents to a search is determined by the totality of the circumstances.  *See United States v. Blake,* 888 F.2d 795, 798 (11th Cir. 1989).  Relevant factors to determine voluntariness, none of which are alone dispositive, include: (1) the voluntariness of defendant's custodial status; (2) the presence of coercive police procedure; (3) the extent and level of defendant's cooperation with police; (4) defendant's awareness of his right to refuse to consent to the search; (5) defendant's education and intelligence; and (6) defendant's belief that no incriminating evidence will be found.  *See id.*

Here, the Court endorses the Report and Recommendation's finding that Defendant freely and voluntarily consented to the search of his SUV.  Although Defendant was detained due to a traffic stop when he consented to the search, his detention did not constitute a restraint on freedom to the degree normally associated with a formal arrest.  The officers did not handcuff, threaten, abuse, or otherwise intimidate Defendant prior to him agreeing to the search.  Defendant was directed to exit the SUV and stand near the passenger's side of Detective Lockhart's patrol car as a safety precaution.  He stood on the side of a public highway during daylight hours at the time of his consent.  Only three officers were present.  Defendant also cooperated with the officers by complying with their

requests. He gave his consent in Spanish, and there is no indication that Defendant's education or intelligence were so deficient as to undermine his ability to consent to the search. Although there is no evidence that Defendant knew he had the right to refuse to consent to the search, the officers were not required to inform him of that right. Accordingly, the weight of the factors shows that Defendant freely and voluntarily consented to the search.

### D. *Miranda* Warnings

Under *Miranda v. Arizona*, 384 U.S. 436 (1966), "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights." *United States v. Parr*, 716 F.2d 796 (11th Cir. 1983). "The requirement that an individual receive *Miranda* warnings before answering questions applies only when the individual is in custody." *United States v. Torkington*, 874 F.2d 1441, 1445 (11th Cir. 1989). In deciding whether an individual is in custody, the test is whether a reasonable person "would have felt a restraint on his freedom equivalent to that normally associated with a formal arrest." *Id.* (citation omitted).

Generally, a person temporarily detained pursuant to an ordinary traffic stop is not "in custody" for purposes of *Miranda*. See *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984); *see also Maryland v. Schatzer,* 559 U.S. 98, 113 (2010) ("[T]he temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody"). A stopped motorist is considered "in custody," however, "if he is subjected to treatment during the traffic stop that amounts to a restriction of freedom to a degree associated with a formal arrest." *United States v. Crawford,* 294 F. App'x 466, 473 (11th Cir. 2008) (citing *Berkemer,* 468 U.S. at 440). A police officer may

11

continue to question a motorist even if he intends to arrest the motorist, as long as that intention is unannounced. See id. at 441-42.

Here, Defendant takes issue with the Report and Recommendation's finding that the statements he made during the stop were not obtained in violation of *Miranda*. (Doc. #69 at 17-21). Defendant contends that he was "in custody" when he made the statements to Detectives Lockhart and Camacho while standing on the side of the highway. The Court disagrees.

In *Crawford*, the Eleventh Circuit found that the defendant was not "in custody" for *Miranda* purposes when he made statements to the officer during the traffic stop, finding persuasive that the defendant stood at the back of his car in a public parking lot, was not physically restrained, was questioned only briefly, and never told that he would be arrested. 294 F. App'x at 474. The court also noted that the defendant was not ordered into a position associated with a formal arrest such as on the ground or against a car, and the officer did not draw his weapon. *Id.* The court thus concluded that the restraint to which the defendant was subjected at the time he made statements was "the minimal amount necessary for such a stop and did not involve the type of highly intrusive coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made." *Id.* (citing *United States v. Acosta*, 363 F.3d 1141, 1150 (11th Cir. 2004)).

At the time of the questioning, Defendant was standing outside the patrol car in public view, not physically restrained, and not told that he was going to be arrested. See *Berkember,* 468 U.S. at 442 ("A police officer's unarticulated plan to arrest a suspect has no bearing on whether a reasonable person would have felt a restraint on his freedom associated with arrest."). The officers neither drew their weapons nor ordered Defendant

12

into a position commonly associated with arrest. Although Detective Camacho told Defendant he could not relieve himself on the side of the highway, the record lacks any suggestion that Detective Camacho told him he could not leave. Moreover, Detective Camacho's refusal to allow Defendant to expose himself in public can hardly be amounted to restraint. In short, the restraint to which Defendant was subjected to when answering Detective Camacho's questions was "the minimal amount necessary for such a stop" and "did not involve the type of 'highly intrusive' coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made." *Acosta,* 363 F.3d at 1150; *see also United States v. Dericho,* No. 2:15-cr-2-FtM-38CM, 2015 WL 5687766, at \*19-20 (M.D. Fla. Sep. 25, 2015). Accordingly, no *Miranda* warnings were required.

## CONCLUSION

After carefully reviewing the Report and Recommendation and the transcript of the evidentiary hearing, the Court agrees with the findings of fact and conclusions of law made by the Magistrate Judge as to each of the issues raised in the motion to suppress. The Court, therefore, will adopt the Report and Recommendation to that extent, and will deny the motion to suppress.

Accordingly, it is

**ORDERED:**

(1) Magistrate Judge Mac R. McCoy's Report and Recommendation (Doc. #65) is **ACCEPTED and ADOPTED** to the extent discussed above, and specifically incorporated into this Order. Defendant Yohany Hernandez-Hernandez's Objections to the Report and Recommendation are **OVERRULED**.

(2) Defendant Yohany Hernandez-Hernandez's Motion to Suppress Evidence (Doc. #39) is **DENIED**.

**DONE AND ORDERED** at Fort Myers, Florida, this 28th day of December, 2015.

*[signature]*
SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: Counsel of Record